**Slip Op. 01-93**

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————— :

BETHLEHEM STEEL CORPORATION, U.S. STEEL
GROUP, A UNIT OF USX CORPORATION, ISPAT          :
INLAND INC., LTV STEEL COMPANY, INC. and
NATIONAL STEEL CORPORATION,                       :

                                    *Plaintiffs,*      :

                v.                                :

UNITED STATES,                                    :    Court No. 99-08-00525

                                    *Defendant,*       :

                and                               :

USINAS SIDERÚRGICAS DE MINAS GERAIS S/A,          :
COMPANHIA SIDERÚRGICA PAULISTA and
COMPANHIA SIDERÚRGICA NACIONAL,                   :

                          *Defendant-Intervenors.*     :

———————————————————————— :

[Determination of U.S. Department of Commerce's International Trade Administration on countervailing duty suspension agreement remanded for action consistent with this opinion.]

Decided:  August 3, 2001

    Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Ellen J. Schneider, Stephen J. Narkin, and Worth S. Anderson) and Dewey Ballantine LLP (Alan Wm. Wolff and Michael H. Stein), for Plaintiffs.

    Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Terrence J. McCartin, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

     Willkie Farr & Gallagher (Christopher A. Dunn, Christopher S. Stokes, Robert L. LaFrankie, and Karl von Schriltz), for Defendant-Intervenors.

## OPINION

RIDGWAY, Judge:

     This action challenges a July 1999 agreement between the U.S. Department of Commerce ("Commerce") and the Government of Brazil, suspending at the eleventh hour the investigation into alleged countervailable subsidies received by three Brazilian steel exporters ("Brazilian Exporters")[1] from the Brazilian Government. *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,797 (Dept. Commerce 1999) (suspension of countervailing duty investigation and entry of suspension agreement) (Public Administrative Record Document ("P.R. Doc.") No. 173) ("Suspension Determination" or "Suspension Agreement" or "Agreement").[2] That investigation was initiated at the behest of, among others, the plaintiff domestic steel producers here ("Domestic Producers").[3] *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From

---

    [1]The three Brazilian exporters who were the respondents in the underlying countervailing duty investigation – Usinas Siderurgicas de Minas Gerais S/A ("USIMINAS"), Companhia Siderurgica Paulista ("COSIPA"), and Companhia Siderurgica Nacional ("CSN") – are Defendant-Intervenors in this action.

    [2]Adopting the convention used in the parties' briefs, citations to the Public Administrative Record are designated "P.R. Doc. No." followed by the number of the particular record as indicated under the handwritten "Doc. #" column in the administrative record filed with the Court. Certain documents inadvertently omitted from the original record filed were forwarded to the Court by letter dated March 23, 2000, and are here designated "Supp. P.R. Doc. No. ____." By letter dated April 27, 2000, additional documents were transmitted. Those documents are designated "Second Supp. P.R. Doc. No. ____."

    [3]The Domestic Producers are Bethlehem Steel Corporation; U.S. Steel Group, a Unit of USX Corporation; Ispat Inland Inc.; LTV Steel Company, Inc; and National Steel Corporation. The

Brazil, 63 Fed. Reg. 56,623 (Dep't Commerce 1998) (initiation of countervailing duty investigation) (P.R. Doc. No. 33).

As the Domestic Producers have observed, a suspension agreement is essentially a unique form of settlement agreement: a settlement agreement to which the complainant – that is, the domestic industry – is not a signatory. Tr. at 5;[4] *see also* 125 Cong. Rec. 20,168 (1979).[5] While Congress has authorized Commerce to enter into suspension agreements, Congress has emphasized the limited circumstances in which such agreements are appropriate, and has established rigorous procedural safeguards to ensure that they are not abused to the detriment of domestic interests.[6]

The law on suspension agreements requires, among other things, that Commerce afford the domestic industry the opportunity to review and comment on any proposed agreement. 19 U.S.C. § 1671c(e) (1994). The Domestic Producers here argue that "there is no indication that anyone at the Department read [their comments]. Indeed, there is substantial evidence that they did not." *See* Plaintiffs' Reply Brief in Support of Motion for Judgment Under Rule 56.2 ("Reply Memo") at 35.

---

Domestic Producers constitute roughly half of the industry overall, and well over half of the industry that participated in the underlying investigation. *See* Bethlehem Steel Corp. v. United States, ____ CIT ____, Slip Op. 01-65 at 2 n.3 (May 29, 2001).

[4]*See* Transcript of oral argument on Plaintiffs' Motion for Judgment on the Agency Record (cited as "Tr. at ___").

[5]In a colloquy immediately preceding the Senate vote on the Trade Agreements Act of 1979, Senator Heinz observed: "When the committee discussed this concept [of suspension agreements] there was some suggestion that it was analogous to settling a case out of court . . . In fact there is a major difference. In a suit any settlement is between plaintiff and defendant. In this bill any settlement is effectively between defendant and judge, a very different relationship, especially when the judge is not always neutral." 125 Cong. Rec. 20,168 (1979).

[6]*See* section I.A, *infra*.

The Domestic Producers further assert that, under the facts of this case, Commerce cannot make the substantive determinations required to justify the Suspension Agreement. *Id. passim.*

Pending before the Court is Plaintiffs' Motion for Judgment Upon the Agency Record (filed under USCIT Rule 56.2), in which the Domestic Producers seek an order directing Commerce to terminate the Suspension Agreement and to issue a countervailing duty order on the subject merchandise. Plaintiffs' motion is opposed by Defendant, the United States ("the Government"), as well as the Brazilian Exporters, who argue that Commerce's determination to suspend the countervailing duty investigation should be sustained in all respects.[7]

Plaintiffs' motion is granted in part. Whether or not Commerce read the comments filed by the Domestic Producers and other petitioners, the record indicates that those comments were not given adequate consideration. Accordingly, for the reasons discussed more fully below, this case is remanded to the Department of Commerce to enable it to comply with the applicable notice, comment and consultation requirements of the statute, and to reconsider its determination in light of all comments and consultation.[8]

---

[7]Two companion cases are also pending before the Court – Court No. 99-08-00524, in which the Domestic Producers challenge a suspension agreement in the parallel antidumping duty investigation, which was the subject of <u>Bethlehem Steel</u>, Slip Op. 01-65; and Court No. 99-08-00528, in which the Brazilian Exporters challenge Commerce's final affirmative countervailing duty determination in the investigation suspended by the agreement at issue here.

[8]Nothing herein should be read to assume the outcome on remand. While it is possible that, upon reconsideration, Commerce will once again conclude that suspension is justified and that the Suspension Agreement should remain unchanged, it is also conceivable that Commerce will determine that – while suspension is justified – some of the terms of the Agreement must be altered, or that Commerce will abandon the concept of a suspension agreement entirely.

# I.  **Background**

## A.  The Suspension Agreement Statute

The statutory provisions authorizing suspension agreements in countervailing duty cases were added to the Tariff Act of 1930 as part of the Trade Agreements Act of 1979 (the "Act").  Prior to the Act, the Secretary of the Treasury – who was then responsible for implementing the antidumping and countervailing duty laws – had the authority to waive the imposition of countervailing duties *after* an investigation was concluded, where the Secretary found that "adequate steps" had been taken to reduce substantially or eliminate the adverse effect of a "bounty or grant."  S. Rep. No. 96-249 at 50-51 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381 at 436-37.  Domestic industries generally were highly critical of the Secretary's exercise of waiver authority.  *See*, *e.g.*, 125 Cong. Rec. 20,161-62 (1979) (Memorandum of Ad Hoc Subsidies Coalition asserting, in relevant part, "5.  Treasury Has Stretched the Authority of the Trade Act of 1974 With Regard to the Granting of Waivers").[9]

The suspension agreement provisions of the Act were adopted to impose "strict limits on discontinuing or suspending investigations pursuant to deals with foreign governments or producers."  125 Cong. Rec. 20,163 (1979).  The provisions on suspension of countervailing duty investigations effected "a major change in . . . [the then-existing] law," eliminating waiver authority and instead "authorizing the suspension of investigations based on agreements with the exporters

---

[9]Legislative history is particularly instructive where, as here, Congress considered the statute at issue as "fast track" legislation.  As a general rule, the "plain meaning" doctrine of statutory construction and its corollaries constrain resort to extrinsic aids in the interpretation and application of a statute, on the theory that the language of the statute as adopted expresses all that Congress intended to say on the subject.  However, because legislators are precluded from amending the language of a "fast track" statute to clarify and amplify its meaning, its legislative history is entitled to special weight.  *See* Bethlehem Steel, Slip Op. 01-65 at 6 n.9, and authorities cited there.

or the government of the country in which the subsidy practice is alleged to occur."  H. Rep. No. 96-317 (1979) at 53.

In authorizing the use of suspension agreements in appropriate countervailing duty cases, Congress recognized their "importance . . . to both importers and domestic industry as a means of achieving the remedial purposes of the law in as short a time as possible and with a minimum expenditure of resources by all parties involved."  H. Rep. No. 96-317 at 53.  *Accord*, S. Rep. No. 96-249 at 54 (suspension agreements "permit rapid and pragmatic resolutions of countervailing duty cases").[10]

But Congress was equally mindful of the potential for abuse of suspension agreements.  To ensure that such agreements are not entered into to the disadvantage of a petitioning domestic industry (for foreign policy or other political reasons), the statute is replete with stringent requirements that must be met before an agreement can be concluded.  Congress emphasized that "the authority to suspend investigations [is to] be exercised within the carefully circumscribed limits" set forth in the law.  H. Rep. No. 96-317 at 53-54; *see also* S. Rep. No. 96-249 at 54 (to ensure that suspension agreements are used only in those cases where they "serve[ ] the interest of the public and the domestic industry affected," agency authority to suspend investigations is "narrowly circumscribed"); 125 Cong. Rec. 20,168-69 (1979) (Senator Heinz's understanding that

---

[10]*See also* H. Rep. No. 96-317 at 55, 65 (advantages of subsection (c) suspension agreements include "the expenses saved because of prompt settlement of a case" and "the certainty of prompt relief" in countervailing duty – as well as antidumping – cases); Statements of Administrative Action for Trade Agreements Act of 1979, H.R. Doc. No. 96-153, Part II at 402, *reprinted in* 1979 U.S.C.C.A.N. 665 at 675 (advantages of suspension agreements under 19 U.S.C. § 1671c(c) include "the value of settling the case quickly" and "the certainty of prompt relief").

suspension agreements permitted only "under certain narrowly constrained circumstances" confirmed by bill managers Senators Ribicoff and Roth). Congress further cautioned that "suspension is an unusual action which should not become the normal means of disposing of [countervailing duty] cases." S. Rep. No. 96-249 at 54.

There are essentially two distinct types of suspension agreements in countervailing duty cases – so-called "subsection (b) agreements" and "subsection (c) agreements." Subsection (b) agreements eliminate or offset completely a countervailable subsidy, or cease exports of the subject merchandise. 19 U.S.C. § 1671c(b). In contrast, subsection (c) agreements do not cease exports; nor do they completely eliminate or offset countervailable subsidies. Rather, they eliminate only the exports' injurious effect. 19 U.S.C. § 1671c(c).

Prior to accepting either a subsection (b) or (c) agreement, Commerce must find both that "suspension of the investigation is in the public interest," and that "effective monitoring of the agreement by the United States is practicable." 19 U.S.C. § 1671c(d). Commerce also is required to notify petitioners of, and consult with them concerning, its intention to suspend the investigation. In addition, Commerce must provide petitioners with a copy of the proposed agreement, and accord them an opportunity to comment. 19 U.S.C. § 1671c(e).

But there are additional requirements for subsection (c) agreements. Because such agreements, by definition, allow some subsidy practices to continue, Congress restricted subsection (c) agreements to cases involving "extraordinary circumstances" – cases where the suspension of the investigation is more beneficial to the domestic industry than its continuation, and where the

investigation is "complex."    *See* S. Rep. No. 96-249 at 51 (discussing the extraordinary circumstances requirement set out in 19 U.S.C. § 1671c(c)(4) ).

Moreover, while all subsection (c) agreements require findings of "extraordinary circumstances" and "complexity" (as discussed above), there are unique requirements for those subsection (c) agreements which are – like the Agreement at issue here – quantitative restriction agreements.[11] Specifically, the statute mandates that, in evaluating the public interest *vis-a-vis* such an agreement, Commerce must both (i) consult with potentially affected consuming industries, as well as potentially affected producers and workers in the domestic industry, and (ii) take into account the impact of such an agreement on U.S. consumers, the international economic interests of the United States, and the competitiveness of the domestic industry (in addition to any other necessary or appropriate factors).  19 U.S.C. § 1671c(d)(1).

As Congress intended, Commerce has invoked the suspension provisions of the trade laws only infrequently in both countervailing duty and antidumping investigations – at least until recently. Notably, prior to the suspensions of both the countervailing duty investigation at issue and the parallel antidumping investigation, Commerce had accepted only four other subsection (c) agreements, including both antidumping[12] and countervailing duty[13] cases.  In each of those cases,

---

[11]A quantitative restriction agreement is an agreement by a foreign government to limit the volume of imports of the merchandise at issue into the United States – that is, an agreement establishing a quota.  *See* 19 U.S.C. § 1671c(c)(3).

[12]*See* Potassium Chloride From Canada, 53 Fed. Reg. 1393 (Dep't Commerce 1988) (suspension of investigation and agreement); Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,618 (Dep't Commerce 1996) (suspension of investigation and agreement).

[13]*See* Steel Wire Rod From Trinidad and Tobago, 62 Fed. Reg. 54,960 (Dep't Commerce 1997) (suspension of investigation and agreement); Steel Wire Rod From Venezuela, 62 Fed. Reg.

Commerce sought – and obtained – the consent of the petitioners.  *See* Reply Memo at 8 n.27 and

authorities cited there.

### B.  The Facts of This Case

On September 30, 1998, the Domestic Producers who are plaintiffs here – among others[14]

– petitioned Commerce and the International Trade Commission ("ITC"), seeking the imposition

of countervailing duties on certain steel products from Brazil.[15]   *See* Letter from

Skadden/Schagrin/Dewey to Commerce and ITC, *and* enclosed Petition (Sept. 30, 1998) (P.R. Doc.

No. 3).  Specifically, the petition alleged that CSN, COSIPA and USIMINAS – Defendant-

Intervenors here – received billions of dollars in equity infusions from the Government of Brazil, at

a time when those companies were neither equity-worthy nor credit-worthy.  *Id.*  The petition was

accepted, and the requested investigation was initiated on October 15, 1998.[16]  *See* 63 Fed. Reg.

56,623.

_____

54,966 (Dep't Commerce 1997) (suspension of investigation and agreement).

[14]The original petitioners also included California Steel Industries, Gallatin Steel Company, Geneva Steel, Gulf States Steel, Inc., IPSCO Steel Inc., Steel Dynamics, Weirton Steel Corporation, the Independent Steelworkers Union, and the United Steelworkers of America.

[15]The same day, the same petitioners filed a petition alleging that CSN, COSIPA and USIMINAS were dumping the same steel products that were the subject of the countervailing duty petition.  The chronology of these two related investigations – which proceeded on parallel timetables and both resulted in suspension agreements – is detailed in Bethlehem Steel, Slip Op. 01-65 at 9-14 (concerning the suspension agreement in the antidumping case).   While that chronology is not set forth here, the implications of the facts of this case can be fully appreciated only in the context of the facts of that case.

[16]On November 12, 1998, the petitioners alleged an additional subsidy practice.  *See* Letter from Skadden Arps to Commerce (Nov. 12, 1998) (P.R. Doc. No. 42).

One month later, the ITC notified Commerce of its preliminary determination, finding that "there [was] a reasonable indication that an industry in the United States [was] threatened with material injury by reason of imports" of the Brazilian steel. *See* Certain Hot-Rolled Steel Products From Brazil, Japan, and Russia, 63 Fed. Reg. 65,221 (ITC 1998) (preliminary injury determination in both countervailing duty investigation and parallel antidumping investigation). On February 12, 1999, Commerce made its preliminary determination, finding that countervailable subsidies indeed were being provided to the Brazilian Exporters. *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 8313 (Dep't Commerce 1999) (preliminary affirmative countervailing duty determination) (P.R. Doc. No. 120).

On June 6, 1999 – literally one month to the day before the statutory deadline for its final determination[17] – Commerce sent the Domestic Producers (among others) an initialed proposed

---

[17]Commerce's timing in this case – as with the suspension agreement in the antidumping investigation at issue in <u>Bethlehem Steel</u>, Slip Op. 01-65 – truly came "down to the wire."

The suspension agreement statute requires that Commerce notify petitioners of its intent to suspend an investigation at least 30 days in advance of the suspension. 19 U.S.C. § 1671c(e)(1). And a suspension agreement can be completed no later than the date of Commerce's final determination. *See*, *e.g.*, S. Rep. No. 96-249 at 15 (suspension to occur "prior to a final determination by the administering authority [*i.e.*, Commerce]"). In this case, the deadline for Commerce's final determination already had been extended several times, and could not be extended past July 6, 1999. *See* 19 U.S.C. §§ 1671d(a)(1), 1673d *et seq.*; 19 C.F.R. § 351.210(b)(2). *See also* Postponement of [F]inal Determination of Antidumping and Countervailing Duty Investigations of Hot-Rolled Flat-Rolled Carbon Quality Steel From Brazil, 64 Fed. Reg. 9474 (Dep't Commerce 1999); Postponement of Final Determination of Antidumping and Countervailing Duty Investigations of Hot-Rolled Flat-Rolled Carbon-Quality Steel From Brazil, 64 Fed. Reg. 24,321 (Dep't Commerce 1999).

In short, under the suspension agreement statute, June 6 was *the last possible day* on which Commerce could notify the petitioners of the Proposed Agreement. Commerce's existing regulations are considerably more stringent. *See* n.24, *infra*.

agreement to suspend the countervailing duty investigation, requesting comments by June 28, 1999. *See* Letters from Commerce to Interested Parties (June 6, 1999) (requesting comments on enclosed Proposed Agreement) (Second Supp. P.R. Doc. No. 1) ("Letters from Commerce to Interested Parties" and "Proposed Agreement").

The following day – June 7 – Commerce issued a news release announcing the Proposed Agreement (as well as a proposed suspension agreement in the parallel antidumping case). In that release, Secretary of Commerce William M. Daley stated that, under the agreement at issue here, "imports [would] not resume until after October 1." *See* Commerce Secretary William M. Daley Announces Tentative Agreements to End Dumping of Brazilian Steel in the U.S., *at* http://www.ita.doc.gov/media/brazilsteel2.htm (June 7, 1999) ("Commerce June 7, 1999 News Release") (*cited in* Letter from Skadden/Dewey/Schagrin to Commerce at 26 n.53 (June 28, 1999) ( P.R. Doc. No. 161) ("Petitioners' Comments") ).

The Domestic Producers (jointly with other petitioners) filed timely comments on the Proposed Agreement. *See* Petitioners' Comments (June 28, 1999) (P.R. Doc. No. 161). Their lengthy submission detailed numerous substantive objections, in support of their argument that the Proposed Agreement failed to meet the requirements of the suspension agreement statute. *Id*. at 1-26. In addition, the petitioners' comments identified a number of drafting errors and inaccuracies in the Proposed Agreement. *Id*. at 26-51. For example, the comments pointed out that the Proposed Agreement invoked *both* subsection (b) *and* subsection (c) of the statute (*see id*. at 2), even though the Proposed Agreement was plainly a subsection (c) agreement. In addition, the comments noted

that the Proposed Agreement failed to include the ban on imports through September 30, 1999, which the Secretary of Commerce had referred to in his June 7 statement. *Id.* at 23 n.49, 26-27 n.53.

A few days later, on July 6, 1999 – the deadline for its final determination in the countervailing duty investigation – Commerce entered into a final agreement suspending that investigation. *See* Suspension Determination/Suspension Agreement, 64 Fed. Reg. 38,797. The final Agreement differed from the Proposed Agreement in only one respect: It incorporated the quota level of zero (effectively banning imports) for the period through September 30, 1999, which had been first announced by the Secretary of Commerce in his statement on the Proposed Agreement one month earlier. *See* Agreement, 64 Fed. Reg. at 38,798; Commerce June 7, 1999 News Release.

Concurrent with its execution and issuance of the final Suspension Agreement, Commerce separately circulated two memoranda setting forth the bases for the determinations supporting its decision to suspend both the countervailing duty investigation and the antidumping investigation. *See* Memoranda from ITA Office of Policy to Ass't Sec. for Import Administration (July 6, 1999) (addressing, respectively, the existence of extraordinary circumstances, and the public interest) (Supp. P.R. Doc. Nos. 1 and 2) ("Extraordinary Circumstances Memo" and "Public Interest Memo").

That same day, Commerce also issued its final affirmative determination in the underlying countervailing duty investigation.[18] Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,742 (Dep't Commerce 1999) (final affirmative countervailing duty

---

[18]A few days earlier, the petitioners in the countervailing duty proceeding had requested that the investigation be continued in the event that "the Department [should] accept an agreement to suspend the investigation on July 6th." *See* Letter from Skadden/Dewey/Schagrin to Commerce (July 2, 1999) (P.R. Doc. No. 162).

determination) (P.R. Doc. No. 172).  Commerce determined net subsidy rates of 6.35% for CSN,

9.67% for USIMINAS/COSIPA,  and 7.81% for all others.  *Id.*

The ITC's final determination – issued August 24, 1999 – confirmed its affirmative

preliminary finding on material injury.  Certain Hot-Rolled Steel Products From Brazil and Russia,

64 Fed. Reg. 46,951 (ITC 1999) (final injury determinations in antidumping and countervailing duty

investigations).

As a result of the Suspension Agreement, no countervailing duty order has issued in this case.

Moreover, in the absence of a request for ITC review of Commerce's determination that the

Agreement eliminated the injurious effects of imports, the suspension of liquidation of the goods at

issue terminated twenty days after notice of suspension agreement was published in the Federal

Register.

## II.  Jurisdiction and Standard of Review

Jurisdiction in this matter is predicated on 28 U.S.C. § 1581(c) (1994). Commerce's decision

to suspend the countervailing duty investigation at issue is reviewable pursuant to 19 U.S.C. §

1516a(a)(2)(B)(iv) (1994), and must be sustained unless it is "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B) (1994).

## III.  The Requirements for Subsection (b) Agreements

The Suspension Agreement states on its face that it was concluded "[p]ursuant to Section

704(b) and (c) of the Tariff Act of 1930, as amended" – that is, pursuant to *19 U.S.C. § 1671c(b)*,

as well as 19 U.S.C. § 1671c(c).  Agreement, 64 Fed. Reg. at 38,798 n.1.  In contrast, the Suspension

Determination invokes only subsection (c).  64 Fed. Reg. at 38,797.  In its brief, the Government

speculates that the Suspension Agreement's reference to subsection (b) was "mere inadvertence,"

confirms that the investigation was suspended based on subsection (c), and argues that – under the

circumstances – the Court should decline to consider whether the Suspension Agreement and the

underlying Suspension Determination would pass muster under subsection (b), because no live case

or controversy is presented.  Defendant's Response in Opposition to Plaintiffs' Motion for Judgment

Upon the Agency Record ("Defendant's Memo") at 25-29.

As the Domestic Producers concede, a Suspension Determination and Agreement need only

meet the requirements of *either* subsection (b) or subsection (c).  *See* Plaintiffs' Brief in Support of

Motion for Judgment Under Rule 56.2  ("Plaintiffs' Memo") at 21 (Suspension Agreement must

fulfill "the provisions of Section 704(b) or Section 704(c)").  Moreover, all parties agree that the

investigation was suspended under subsection (c).  *See* Defendant-Intervenors' Memorandum of

Points and Authorities ("Defendant-Intervenors' Memo") at 9; Reply Memo at 2 n.3.  Accordingly,

the Domestic Producers' arguments concerning subsection (b) are moot.  *See* Plaintiffs' Memo at

22-28 (arguing that Suspension Agreement and underlying Suspension Determination do not meet

standards of subsection (b) ).

When Commerce admits that it has made clerical errors, it should be given the opportunity

to correct its mistakes.  *See*, *e.g.*, Gilmore Steel Corp. v. United States, 7 CIT 219, 223, 585 F. Supp.

670, 674, (1984).  Even if the ultimate result would not be affected, it is appropriate to direct

Commerce to correct errors if remand is otherwise necessary. Federal-Mogul Corp. v. United States,

18 CIT 1168, 1172, 872 F. Supp. 1011, 1014 (1994) (*citing* <u>Brother Indus., Ltd. v. United States</u>, 15 CIT 332, 346, 771 F. Supp. 374, 388 (1991) ).

As discussed below, the Suspension Agreement and Commerce's underlying Suspension Determination were not in accordance with law. *See* section IV.A, *infra*. Because the case is being remanded to Commerce in any event, it is appropriate to direct Commerce to correct clerical errors at that time. *See* <u>Brother Indus.</u>, 15 CIT at 346, 771 F. Supp. at 388. Therefore, on remand, Commerce shall correct its error and clarify that the suspension of the investigation was based solely on subsection (c), by revising the Suspension Agreement to eliminate all references to 19 U.S.C. § 1671c(b).

## IV.  <u>The Requirements for Subsection (c) Agreements</u>

As discussed above (*see* section III), all parties agree that – notwithstanding the Agreement's reference to subsection (b) – the investigation at issue actually was suspended under subsection (c), *i.e.*, 19 U.S.C. § 1671c(c). The Domestic Producers challenge virtually every aspect of that suspension, arguing (a) that Commerce failed to comply with the notice, comment and consultation requirements of the suspension agreement statute; (b) that effective monitoring of the Agreement is not practicable; (c) that there are no "extraordinary circumstances" in this case (*i.e.*, that the Agreement is not more beneficial to the domestic industry than continuation of the investigation,[19]

---

[19]Although the statute speaks of weighing the benefits of a suspension agreement against the benefits of "continuation of the investigation" (*see* 19 U.S.C. § 1671c(c)(4)(A)(i) ), the parties in this case have used *continuation of the investigation* and *entry of a countervailing duty order* interchangeably – perhaps due to the unusual procedural context of the Agreement at issue (*i.e.*, Commerce's issuance of the Suspension Determination and Agreement on the same day as its Final Determination). *See*, *e.g.*, Plaintiffs' Memo at 31-32 (proposed agreement "guaranteeing unfairly-

and that the investigation was not complex); and (d) that the Agreement does not serve the public interest.

### A. Notice, Comment and Consultation

The Domestic Producers argue that Commerce failed to comply with the notice, comment and consultation requirements of the suspension agreement statute, asserting that Commerce disregarded the petitioners' written comments on the Proposed Agreement and failed to "consult meaningfully" with them. *See generally* Plaintiffs' Memo at 51-53; Reply Memo at 34-37.

The notice, comment and consultation requirements mandate that, before entering into a suspension agreement, Commerce must:

> (1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation . . . not less than 30 days before the date on which it suspends the investigation,
>
> (2) provide a copy of the proposed agreement to the petitioner . . . together with an explanation of how the agreement will be carried out and enforced (including any action required of foreign governments), and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d) of [the statute], and
>
> (3) permit all interested parties . . . to submit comments and information for the record before the date on which notice of suspension of the investigation is published . . . .

---

traded imports a share of the U.S. market" not "more advantageous to the domestic industry than the relief from such imports *under an order*") (emphasis supplied); Defendant's Memo at 29-30 ("Commerce found that . . . the agreement provides greater relief and certainty *than a countervailing duty order*") (paraphrasing Extraordinary Circumstances Memo, which also refers to an order) (emphasis supplied); Defendant-Intervenors' Memo at 17 ("[t]aken together, these two Agreements [the Agreement at issue here and the suspension agreement in the related antidumping case] provide numerous protections that are more beneficial to the domestic industry than would be the case *if the CVD order were imposed*") (emphasis supplied).

19 U.S.C. § 1671c(e).[20]  The legislative history of the statute highlights the importance of those

provisions, emphasizing that "the requirement that the petitioner be consulted will not be met by pro

forma communications.  Complete disclosure and discussion is required." S. Rep. No. 96-249 at 54.

The Government maintains that Commerce complied fully with all applicable notice,

comment and consultation requirements. In support of that claim, the Government notes that

petitioners were provided with a copy of the Proposed Agreement and accorded an opportunity to

comment on it – facts which are not in dispute.  Defendant's Memo at 57.  The Government also

points to the Suspension Determination, which states that "[t]he Department consulted with the

parties to the proceeding and has considered their positions with respect to the proposed suspension

agreement" (64 Fed. Reg. at 38,797),[21] and to the Public Interest Memorandum, which asserts that

---

[20]In addition to the consultation requirements of 19 U.S.C. § 1671c(e) (which govern all suspension agreements under both subsections (b) and (c) ), there are additional consultation requirements which apply to quantitative restriction agreements such as the Suspension Agreement at issue here. *See* 19 U.S.C. § 1671c(d)(1).

[21]While the Government's brief actually states that Commerce "met several times" with petitioners "regarding its intention to suspend the investigation" (Defendant's Memo at 57; *see also* Defendant-Intervenors' Memo at 6), the only record evidence cited to support that assertion is the Suspension Determination, which states simply that the petitioners were "consulted." 64 Fed. Reg. at 38,797.  The Suspension Determination does not quantify the extent of consultation in any way; nor does it indicate whether that consultation occurred in face-to-face meetings or some other fashion. *Id.*; *see generally* Tr. at 47-49 (Government counsel discusses extent and nature of consultation required).

According to the Domestic Producers, "[t]he Department did inform the Petitioners several times that it was determined to suspend the investigation regardless of whether Petitioners objected. However, the Department never consulted with the Petitioners regarding the details of the Agreement, as opposed to the concept of suspending the investigation.  Petitioners had to rely on their written comments to demonstrate the Agreement's unlawful provisions." Reply Memo at 37 n.124.

"the Department has consulted with parties affected" by the Suspension Agreement and that "the Department consulted extensively with domestic producers and unions, explaining what the [countervailing duty and antidumping suspension] Agreements will do, how they will work, and how they will be enforced" (Supp. P.R. Doc. No. 2).[22]  Defendant's Memo at 57; Tr. at 42.  Apart from those conclusory statements, however, there is no affirmative record evidence to indicate that Commerce even reviewed – much less considered or responded to – the petitioners' written comments.[23]

---

[22]In addition, the Brazilian Exporters point to Commerce's cover letter to petitioners, transmitting the Proposed Agreement.  In that letter, the Assistant Secretary of Commerce states that he "will instruct [his] staff to consult with potentially affected consuming industries and potentially affected producers and workers in the domestic industry . . ." Defendant-Intervenors' Memo at 52 (*citing* Letters from Commerce to Interested Parties (June 6, 1999) (Second Supp. P.R. Doc. No. 1) at 2).

[23]The Domestic Producers intimate that Commerce is obligated to provide specific, written responses to petitioners' comments.  Plaintiffs' Memo at 51-52; Reply Memo at 35.  But the authorities they cite do not necessarily compel that conclusion.

In support of their argument, the Domestic Producers rely heavily on conference materials prepared by Commerce personnel, which state that petitioners' comments on a proposed suspension agreement "are formal, on-the-record comments which that Department will address, through changes to the initialed suspension agreement and/or through written responses in a memorandum prepared simultaneously with the final suspension agreement."  Mark A. Barnett and Melissa G. Skinner, Suspension of Antidumping and Countervailing Duty Investigations, *in* The Commerce Department Speaks on International Trade & Investment 995, 1002 (Practising Law Institute 1998), *cited in* Plaintiffs' Memo at 52 *and* Reply Memo at 35 n.117.  *See also* Tr. at 28-29.

However, as the Government notes (and, indeed, the Domestic Producers concede), the Barnett/Skinner paper was prepared by Commerce personnel in their individual capacities, and not as a statement of official agency policy.  Tr. at 28, 38-39.  There is no indication that the position set forth in the paper has ever been formally adopted by Commerce.

Nor is it clear that the absence of a written response to the petitioners' comments is a departure from Commerce's normal practice in cases of this type.  Indeed, assuming *arguendo* that

The Government and the Brazilian Exporters nevertheless argue that Commerce's statements

_____

the low number of subsection (c) agreements prior to this one can be said to establish a practice (*see* n.37, *infra*), it appears that Commerce's uniform practice – in both antidumping duty and countervailing duty investigations –  has been *not* to respond to petitioners' comments. *See, e.g.,* Potassium Chloride From Canada, 53 Fed. Reg. 1393 (Dep't Commerce 1988); Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,618 (Dep't Commerce 1996); Steel Wire Rod From Trinidad and Tobago, 62 Fed. Reg. 54,960 (Dep't Commerce 1997); Steel Wire Rod From Venezuela, 62 Fed. Reg. 54,966 (Dep't Commerce 1997).  Of course, as discussed above (*see* section I.A, *supra*), in the case of all prior subsection (c) agreements, Commerce sought and obtained the petitioners' consent. It is thus possible that the petitioners in those cases filed no substantive comments for Commerce to answer.

Commerce's practice in the case of subsection (b) agreements depends on whether the investigation at issue is a countervailing duty investigation or an antidumping duty investigation. When Commerce enters into a subsection (b) agreement in a countervailing duty case, it typically publishes written responses to petitioners' comments. *See*, *e.g.*, Steel Wire Rope From South Africa, 47 Fed. Reg. 54,130 (Dep't Commerce 1982); Galvanized Steel Wire Strand From South Africa, 48 Fed. Reg. 19,451 (Dep't Commerce 1983); Steel Pipe and Tube Products From South Africa, 48 Fed. Reg. 24,407 (Dep't Commerce 1983); Certain Textile Mill Products From Thailand, 50 Fed. Reg. 9832 (Dep't Commerce 1985); Iron Ore Pellets From Brazil, 50 Fed. Reg. 24,265 (Dep't Commerce 1985); Miniature Carnations from Columbia, 52 Fed. Reg. 1353 (Dep't Commerce 1987); Certain Fresh Cut Flowers from Costa Rica, 52 Fed. Reg. 1356 (Dep't Commerce 1987).

In contrast, when Commerce enters into a subsection (b) agreement in an antidumping duty case, it does not respond to petitioners' comments. *See, e.g.,* Erasable Programmable Read Only Memory Semiconductors From Japan, 51 Fed. Reg. 28,253 (Dep't Commerce 1986); Dynamic Random Access Memory Semiconductors of 256 Kilobits and Above from Japan, 51 Fed. Reg. 28,396 (Dep't Commerce 1986); Gray Portland Cement and Clinker From Venezuela, 57 Fed. Reg. 6706 (Dep't Commerce 1992); Certain Portable Electric Typewriters From Singapore, 58 Fed. Reg. 39,786 (Dep't Commerce 1993); Color Negative Photographic Paper (CNPP) and Chemical Components Thereof From the Netherlands, 59 Fed. Reg. 43,539 (Dep't Commerce 1994); Sodium Azide From Japan, 62 Fed. Reg. 973 (Dep't Commerce 1997); Certain Cut-to-Length Carbon Steel Plate From South Africa, 62 Fed. Reg. 61,751 (Dep't Commerce 1997); Steel Wire Rod From Venezuela, 63 Fed. Reg. 8948 (Dep't Commerce 1998).

But even if Commerce is not obligated to provide specific, written responses to petitioners' comments, it must articulate its rationale with sufficient clarity to enable a court to "satisfy itself that the agency exercised a *reasoned* discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *See* Greater Boston Television Corp. v. Federal Communications Comm'n, 444 F.2d 841, 850 (D.C. Cir. 1971) (emphasis supplied).

on the record must be presumed to be the truth.  Tr. at 54-55; Defendant-Intervenors' Memo at 52.

According to the Brazilian Exporters:

> If Plaintiffs are somehow to accuse the Department of not fulfilling [its notice, comment and consultation requirements], . . . they must provide proof to support their claim. . . . The fact that the Department did not revise the Agreement in accordance with Plaintiffs' desires does not, *vel non*, demonstrate that the Department did not consider these comments.  It simply demonstrates that the Department chose not to incorporate them.

Defendant-Intervenors' Memo at 52.

As the Government notes, "[a]bsent some showing to the contrary, the agency is presumed to have considered all of the evidence of record."  Defendant's Memo at 58, *citing* Hoogovens Staal BV v. United States, 93 F. Supp. 2d 1303, 1307 (Ct. Int'l Trade 2000), *appeals docketed*, Nos. 00-1432, -1433 (Fed. Cir. June 28, 2000).  However, that presumption is rebuttable – and, indeed, it is rebutted by the evidence in this case.

The Suspension Agreement itself belies any claim that the Government considered the petitioners' written comments on the Proposed Agreement.  Those comments not only detailed the petitioners' substantive objections to suspension of the investigation, but also pointed out a number of drafting errors and inaccuracies in the Proposed Agreement.  *See* Petitioners' Comments *passim*.

A prime example is the Suspension Agreement's erroneous reference to subsection (b), discussed in section III above, which was also present in the Proposed Agreement.  *Compare* Suspension Agreement, 64 Fed. Reg. at 38,798 n.1, *with* Proposed Agreement at 1 n.1.  While the Government now postulates that the existence of that mistake in the final Suspension Agreement is attributable to "mere inadvertence" (Defendant's Memo at 27), the Proposed Agreement's erroneous reference to subsection (b) could not possibly have escaped the notice of anyone reading the

petitioners' written comments. The first twelve pages of those comments were devoted exclusively

to an in-depth analysis of why the Proposed Agreement did not satisfy the statutory requirements of

subsection (b). *See* Petitioners' Comments at 1-12.

As proof that Commerce in fact did consider the petitioners' written comments,[24] the

Government points to the only difference between the Proposed Agreement and the final Suspension

Agreement: The provision establishing a quota level of zero for the interim period (from July 19,

1999 – the effective date of the Suspension Agreement – through October 1, 1999), which was

missing from the Proposed Agreement and was raised in the petitioners' written comments.

---

[24]At oral argument, counsel for the Government cited the press of time as the reason why Commerce's Suspension Determination did not respond to the petitioners' written comments and why Commerce did not engage in greater consultation. *See generally* Tr. at 42-44. However, as discussed above, Commerce in fact has made a practice of responding to petitioners' comments on suspension agreements in *some* contexts. *See* n.23, *supra*. To the extent that the time pressure on Commerce personnel considering the Suspension Agreement here may have been greater than in other cases (because of the imminent, firm deadline for their issuance of Commerce's Final Determination), it suffices to note that that dilemma was of Commerce's own making. *See* n.17, *supra* (explaining how Commerce's timing here "came down to the wire"). No doubt the tandem tasks of both finalizing the Final Determination and determining whether to suspend the investigation in fact did tax Commerce personnel to the limit.

Indeed, in 1997, Commerce revised its regulations to significantly advance the deadlines for initialing and signing suspension agreements to avoid precisely this dilemma – the "enormous burden on the parties and on the Department" inherent in the simultaneous consideration of a suspension agreement and preparation of a final determination. *See* 61 Fed. Reg. 7308, 7315 (1996); 62 Fed. Reg. 27,296, 27,313 (1997). Under those regulations, a copy of any proposed countervailing duty suspension agreement must be forwarded to petitioners no later than 15 days after Commerce's preliminary determination, and Commerce must accept or reject a final agreement no later than 45 to 60 days after the preliminary determination (depending on the circumstances). *See* 19 C.F.R. §§ 351.208(f)(1)(ii), 351.208(f)(2)(i)(B), 351.208(g)(1). The parties' briefs do not disclose why that regulatory timeline was not followed here.

Defendant's Memo at 58 *and* Tr. at 50-53; Petitioners' Comments at 23-24. *Compare* Proposed

Agreement *with* Agreement, Part IV, 64 Fed. Reg. at 38,798. But, in the June 7, 1999 news release

announcing the Proposed Agreements in both the countervailing duty and antidumping duty cases,

the Secretary of Commerce stated that, under the agreement at issue here, "imports [would] not

resume until after October 1." *See* Commerce June 7, 1999 News Release. Thus, the Suspension

Agreement's provision establishing the quota for the interim period was not inspired by the

petitioners' comments; its omission from the Proposed Agreement was simply a drafting or clerical

error.

The Government concedes that Commerce intended from the start to include a quota level

for the interim period in the agreement, but posits that it was the petitioners' written comments that

brought the omission in the Proposed Agreement to Commerce's attention and ensured the

provision's inclusion in the final Suspension Agreement. Defendant's Memo at 58; Tr. at 50-51.

However, the Government's position is mere speculation. There is no evidence on the record (such

as an agency decision memorandum) to support the Government's claim of "cause and effect"; that

is, there is nothing to indicate that the change between the Proposed Agreement and the final

Agreement was made in response to the petitioners' comments. And it is difficult to imagine that

– had Commerce actually considered the petitioners' comments – it would have corrected only one

of the numerous drafting and clerical errors that the petitioners identified, and ignored all the

others.[25]

---

[25]For example, in addition to the Proposed Agreement's erroneous reference to subsection
(b), the petitioners' written comments also highlighted its inclusion of two sections numbered I.D,
and its erroneous definition of "Hot-Rolled Steel" by reference to "Appendix II" (when the definition

At oral argument, counsel for the Government acknowledged that Commerce is obligated not only to solicit the petitioners' comments, but also to consider them. Tr. at 44-46. Commerce's failure in this case to correct in the final Suspension Agreement even the drafting and clerical errors identified by the petitioners is compelling evidence that Commerce failed to give appropriate consideration to the petitioners' written comments.

Due to Commerce's failure to comply with the notice, comment and consultation requirements of the suspension agreement statute, any "substantial evidence" review of Commerce's factual findings would be premature at this time. Even as to the legal issues presented, the considerations of judicial economy and deference to agency autonomy and expertise that undergird the related doctrines of exhaustion and ripeness counsel remand here.

Remand will afford Commerce to consider the Domestic Producers' comments, find facts, apply its expertise to the record, articulate its interpretation of the statute, and explain the bases for its action. Remand also will protect agency autonomy, and allow Commerce to exercise the discretion granted it by Congress. Finally, by affording Commerce an opportunity to correct any errors it may have made, remand conceivably may obviate entirely the need for further judicial review. *See* n.8, *supra*. *See generally* 2 K. Davis & R. Pierce, Jr., Administrative Law Treatise §§ 15.2 (*citing* McKart v. United States, 395 U.S. 185, 193-95 (1969) ), 15.12 (3d ed. 1994).

Accordingly, for the reasons set forth above, this matter is remanded to Commerce, so that it may reconsider its Suspension Determination, giving due consideration to *all* of the petitioners'

---

actually appears in Appendix I). Petitioners' Comments at 34. Yet none of these other drafting or clerical errors were corrected in the final Agreement.

comments – the substantive ones as well as those identifying drafting or clerical errors, and so that

it may undertake any further consultation that may be appropriate.[26]

## B.  The Practicability of Effective Monitoring

The statute permits suspension agreements only where "effective monitoring of the

agreement by the United States is practicable."  19 U.S.C. § 1671c(d)(1)(B).  The statute's legislative

history underscores the importance of effective monitoring provisions:

> The committee intends that no agreement be accepted unless it can be effectively
> monitored by the United States.  This will require establishment of procedures under
> which entries of merchandise covered by an agreement can be reviewed by the
> authority and by interested parties.  Adequate staff and resources must be allocated
> for monitoring to insure that relief under the agreement occurs.

S. Rep. No. 96-249 at 54.

The Domestic Producers attack the monitoring provisions of the Agreement on three grounds.

Their first complaint is the absence of any requirement that the Brazilian Government notify

---

[26]As discussed above, 19 U.S.C. § 1671c(e) imposes on Commerce three notice, comment and consultation requirements.  In addition to (i) affording petitioners notice of and an opportunity to comment on a proposed suspension agreement and (ii) explaining to petitioners "how the agreement will be carried out and enforced, and . . . how the agreement will meet [the applicable requirements of the statute]," Commerce also must (iii) "consult" with petitioners "concerning [ ] its intention to suspend the investigation."  While the Domestic Producers broadly assert that Commerce failed to "consult meaningfully" with the petitioners (Plaintiffs' Memo at 53), their briefs to date have focused primarily on the extent of Commerce's consideration of its written comments on the Proposed Agreement.  *But see*, *e.g.*, Reply Memo at 37 n.124 (asserting that "Commerce never consulted with the Petitioners regarding the details of the Agreement, as opposed to the concept of suspending the investigation").  Thus, it suffices here to note that the consultation requirement of 19 U.S.C. § 1671c(e) – like that of 19 U.S.C. § 1671c(d)(1) – is an obligation separate and distinct from the statute's notice and comment requirements.  There is no need at this point to reach the issue of the nature, scope and extent of the consultation mandated by the statute.

Commerce of its bestowal of *domestic* subsidies – the subsidy practice at issue in the underlying investigation. Plaintiffs' Memo at 49.

The Brazilian Exporters counter that there is no need for such a provision, because the Brazilian companies at issue in the investigation have now been "privatized." Defendant-Intervenors' Memo at 47-48. The Brazilian Exporters reason that, in order to make an equity infusion into one of those companies now, the Brazilian Government would have to obtain an equity position from a current private owner – at market value. *Id*. at 48. The Brazilian Exporters therefore conclude that it is a "practical impossiblity" for the Brazilian Government to make countervailable "equity infusions."[27] *Id*.

As the Domestic Producers note, however, that is not necessarily true. Rather than purchasing existing shares from current private owners, the Brazilian Government could instead buy new shares issued by the company. *See* Reply Memo at 32. Such a purchase would indeed confer a subsidy if the Brazilian Government paid above market value prices for the new shares.

The defendant U.S. Government takes a different tack, contending in essence that any future domestic subsidies would be irrelevant to the Agreement. According to the Government,

---

[27]There appears to be some dispute as to the extent of the privatization. The Brazilian Exporters assert that "the Brazilian government either has no interest or a minor residual interest" in the Brazilian steel companies at issue. Defendant-Intervenors' Memo at 48. However, they cite no record evidence to support that claim. In contrast, the Domestic Producers contend that the Brazilian Government "still owns a significant part of COSIPA" – an assertion they support with a reference to the Brazilian Government's response to a questionnaire in the underlying countervailing duty investigation, which indicates that "[a]s of Dec. 31, 1997, the Federal Government owned 73.16% of COSIPA's preferred stock, or 16.8 percent of its total equity." Reply Memo at 31-32 n.105 (citations omitted). In any event, as the Domestic Producers note, "the [Government of Brazil] could renationalize [the Brazilian Exporters] if the Brazilian economy falters or fiscal policy changes." *Id*.

Commerce's obligation is to monitor compliance with the terms of the Agreement – and the Agreement only imposes export limits and prohibits export subsidies or import substitution subsidies. In short, the Government argues, because the Agreement does not prohibit the bestowal of domestic subsidies, Commerce is not obligated to monitor them.[28] Defendant's Memo at 52-53.

The Domestic Producers read Commerce's monitoring obligations more broadly, asserting that "Congress required monitoring of a suspension agreement in order to ensure compliance both with its own terms *and* with the terms of the statute." Reply Memo at 31 (*citing* H.R. Rep. No. 96-317 at 55, 66).[29] The Domestic Producers note that the statute requires complete elimination of the injury from subsidized imports, *see* Reply Memo at 31 (*citing* 19 U.S.C. § 1671c(c)(1) ) – in this case, injury resulting from *domestic* subsidies. They therefore conclude that, since "[t]he provision of additional domestic subsidies would destroy the efficacy of the Agreement," the Agreement cannot be practicably monitored in the absence of provisions requiring notification of the bestowal of such subsidies. Reply Memo at 31.

---

[28]The Government contends that, "[b]y suggesting that Commerce should have included a provision addressing the bestowal of domestic subsidies, [the Domestic Producers are] essentially making an argument that is applicable to a suspension agreement entered into pursuant to 19 U.S.C. § 1671c(b), where the objective is to eliminate the countervailable subsidy completely. In this case, however, Commerce entered into a different type of suspension agreement." Defendant's Memo at 52 n.31.

[29]The Domestic Producers bolster their case by reference to the report of the House Ways and Means Committee, which states: "Effective administration of [the] section [concerning suspension of antidumping investigations] requires careful monitoring of any agreement to ensure compliance with the terms of the agreement *and the requirements of that section*." H.R. Rep. No. 96-317 at 66 (emphasis supplied). *See also id*. at 55 (discussion of monitoring requirements for agreements suspending antidumping investigations equally applicable to agreements suspending countervailing duty investigations).

The Domestic Producers' second critique of the Agreement is that it includes no "provisions preventing circumvention through the use of swaps or transshipment through third countries, even though such provisions have been included in other countervailing duty suspension agreements." Plaintiffs' Memo at 49-50.[30] Absent such provisions, the Domestic Producers assert that Commerce "will have no means to determine whether imports of the subject merchandise are exceeding the [Agreement's] quota" of 295,000 metric tons per year. *Id*. at 50; Agreement, Part IV, 64 Fed. Reg. at 38,798.

The Government and the Brazilian Exporters point to Part VI of the Agreement, entitled "Anticircumvention," asserting that it "contains very broad language that addresses all types of circumvention that might occur." *See* Defendant's Memo at 53-54; Defendant-Intervenors' Memo at 48-49 (*citing* Agreement, Part VI, 64 Fed. Reg. at 38,799-800). In particular, they note that the Agreement addresses transshipping by prohibiting Brazilian exporters from shipping steel "directly or indirectly" to the United States without an export license. Defendant-Intervenors' Memo at 48 (*citing* Agreement, Part VI.A, 64 Fed. Reg. at 38,799-800). In addition, they note that the Agreement prohibits "any payments to one party for hot-rolled steel delivered or *swapped* by another party." Defendant's Memo at 53-54; Defendant-Intervenors' Memo at 48-49 (*citing* Agreement, Part VI.B.4, 64 Fed. Reg. at 38,800) (emphasis supplied by Defendant-Intervenors).

---

[30]As examples of suspension agreements including provisions on transshipment and swapping, the Domestic Producers cite Steel Wire Rod From Venezuela, 62 Fed. Reg. 54,966, 54,970 (1997) (Agreement, Art. IV.E) and Steel Wire Rod From Trinidad and Tobago, 62 Fed. Reg. 54,960, 54,963-64 (1997) (Agreement, Art. IV.E). *See* Plaintiffs' Memo at 50 n.124.

But the Domestic Producers take little comfort in those provisions, noting that the Agreement provides only for the investigation of potential instances of anticircumvention *brought to the attention of Commerce*. Reply Memo at 32-33 (*citing* Agreement, Part VI, 64 Fed. Reg. at 38,799-800). The Domestic Producers assert that, as a practical matter, the only interested parties with access to the information required to detect transshipment or swapping are the Brazilian Exporters – and the Agreement does not obligate them to report it. Reply Memo at 33.

The Domestic Producers' third challenge to the monitoring provisions of the Agreement goes to the definition of "violation." They note that Commerce's regulations define a violation as:

> . . . noncompliance with the terms of a suspension agreement caused by an act or omission of a signatory, except, *at the discretion of the Secretary*, an act or omission which is inadvertent or inconsequential.

Plaintiffs' Memo at 50 (*quoting* 19 C.F.R. § 351.209(e) ) (emphasis supplied by Plaintiffs). The Domestic Producers point out that the Agreement makes two changes – an addition and a deletion – to the definition in Commerce's regulations.

First, the Agreement defines "violation" to exclude not only noncompliance that is inadvertent or inconsequential, but also noncompliance that "does not substantially frustrate" the purposes of the Agreement. *See* Agreement, Part I.J, 64 Fed. Reg. at 38,798. The Domestic Producers argue that *any* frustration of the purposes of the Agreement – whether substantial or not – must be deemed a violation, because "if the purpose is frustrated the Agreement will neither completely eliminate or offset the subsidies nor eliminate their injurious effects, as required by the statute." Plaintiffs' Memo at 50-51.

The Government and the Brazilian Exporters defend the Agreement's definition of "violation." The Brazilian Exporters argue generally that the Agreement "provides the Department with the necessary authority and discretion to determine and punish violations as it deems appropriate." Defendant-Intervenors' Memo at 49. The Government observes that the statute itself does not define "violation," and asserts that "nothing from the statute or legislative history indicates that Congress intended Commerce to require strict compliance with suspension agreements."[31] Defendant's Memo at 55. But the Government's main argument is that, since courts do not overturn agency action for harmless error, it should be equally permissible for an agency to overlook harmless error committed by a party to a suspension agreement. *Id*. at 55.

The Domestic Producers reject the Government's analogy. According to the Domestic Producers, errors are "inadvertent," and *harmless* errors are "inconsequential." Reply Memo at 34. Thus, they reason, harmless error is fully covered by the exclusions for inadvertence and inconsequential noncompliance that appear in both the regulations and the Agreement. *Id*. The Domestic Producers conclude that noncompliance that "does not substantially frustrate the purpose of the agreement" is perforce an exclusion above and beyond harmless error, and is not permitted by Commerce's own regulations. *Id*.

---

[31]The Domestic Producers have not specifically challenged this broad claim by the Government. But it is rather at odds with the prevailing environment at the time the suspension agreement statute was enacted. Indeed, the legislative history of that statute as a whole reflects an undercurrent of Congressional concern about the potential for abuse of suspension agreements, and the importance of their vigorous enforcement. *See generally* section I.A, *supra*; *see also*, *e.g*., H.R. Rep. No. 96-317 at 66 (discussing "Monitoring of agreement" and expressing concern that relief under a suspension agreement "not [be] undermined by inadequate enforcement").

The Domestic Producers also object to the omission of the phrase "at the discretion of the Secretary" from the Agreement's definition of "violation," expressing concern that the omission "suggests that it is no longer in [the Secretary's] sole discretion whether a violation is inadvertent or inconsequential." Plaintiffs' Memo at 51. But the Government contends that the Domestic Producers are reading too much into the omission, and that their fears are unfounded. According to the Government, the plain language of the Agreement makes it clear that Commerce retains the discretion to determine whether a violation has occurred. Defendant's Memo at 54-55 (*quoting* Agreement, Part X, 64 Fed. Reg. at 38,801: "[i]f the DOC determines that this Agreement is being or has been violated . . .").

Although the issue of the practicability of effective monitoring has been fully briefed before the Court, it is not yet ripe for judicial review. For the reasons discussed in section IV.A above, this case is being remanded to allow Commerce to reconsider the Suspension Agreement and the underlying Suspension Determination. On remand, Commerce will have the opportunity to articulate its interpretation of the monitoring provisions of the statute and to reconsider its determination, giving due consideration to all of the petitioners' comments – including those on the monitoring provisions of the Agreement – with the benefit of the further amplification and explication of the Domestic Producers' briefs before the Court.

## C. Extraordinary Circumstances

Subsection (c) agreements are limited to cases involving "extraordinary circumstances" – that is, "circumstances in which – (i) suspension of an investigation will be more beneficial to the domestic industry than continuation of the investigation, and (ii) the investigation is complex." 19

U.S.C. §§ 1671c(c)(1), 1671c(c)(4)(A). The Domestic Producers contest both parts of Commerce's

determination that extraordinary circumstances are present in this case.

1.  Whether the Agreement Is More Beneficial
to the Domestic Industry than Continuation of the Investigation

As a threshold matter, the Domestic Producers contend that the petitioners' consent is

required for a subsection (c) agreement – that is, that the petitioning domestic industry wields "veto

power" over suspension agreements such as the Agreement at issue here. Reply Memo at 3-9; Tr.

at 15-19.[32]  In short, the Domestic Producers claim that their opposition is, in and of itself, sufficient

_____

[32]The Government advances its own threshold argument – apparently contending that the
Domestic Producers are effectively estopped from challenging Commerce's determination that the
Agreement is more beneficial to the domestic industry than continuation of the investigation. *See*
Tr. at 30-32, 56-57, 62. Specifically, the Government asserts that, if the Domestic Producers did not
believe that the Agreement "eliminate[s] completely the injurious effects of [the relevant] exports
to the United States," they should have petitioned the ITC under 19 U.S.C. § 1671c(h)(3) for review
of that aspect of Commerce's Suspension Determination. Defendant's Memo at 43.

It is worth noting that the Government has not made this argument in the companion case,
Court No. 99-08-00524, which challenges the suspension agreement in the related antidumping
proceeding. Indeed, even in its brief in this case, the Government did not raise the point in either
its introduction (not in its Statement Pursuant to Rule 56.2, not in its Statement of Facts, and not in
its Summary of Argument) or in its discussion of the "beneficiality" requirement of the
"extraordinary circumstances" criterion. *See* Defendant's Memo at 2-17, 29-32. The Government's
brief presented the "exhaustion" argument only as part of its case on the "public interest" criterion
– and then only in passing. *See* Defendant's Memo at 43. And neither the Brazilian Exporters nor
the Domestic Producers addressed the point in their papers. *But see* Tr. at 27 (counsel for Domestic
Producers responds to exhaustion argument).

Because this matter is being remanded for the reasons set forth in section IV.A above, there
is no need now to reach the merits of the Government's argument on exhaustion. In the briefing that
follows the filing of Commerce's determination on remand, all parties will have the opportunity to
address the Government's argument in detail, focusing on, *inter alia*, the language of 19 U.S.C. §
1671c(h)(3), its legislative history, the underlying policy, and its relationship to and interaction with
other relevant sections of the international trade laws.

to defeat the Agreement. Reply Memo at 15. In support of that argument, the Domestic Producers invoke both the legislative history of the suspension agreement statute, and Commerce's past practice in the application of the statute. *See* Reply Memo at 3-9.

On its face, the language of the suspension agreement statute "entrust[s] the 'more beneficial' determination to Commerce, and . . . [does] not expressly accord the domestic industry a veto power." Bethlehem Steel, Slip Op. 01-65 at 36 (footnotes omitted). However, as the Domestic Producers emphasize, Senator Heinz observed in an orchestrated colloquy immediately preceding the Senate vote on the legislation that he "would find it very difficult to believe a judgment that the domestic industry would benefit more from a suspension agreement than a completed investigation if that industry had expressed its opposition to such an action." Reply Brief at 3 (*quoting* 125 Cong. Rec. 20,168 (1979) ).[33]

While the Government and the Brazilian Exporters here seek to minimize the Senator's observation (Defendant-Intervenors' Memo at 21-22; Tr. at 37, 40, 66-67), the Domestic Producers point out that "the Department previously has not only given great weight to Senator Heinz' statement, but concluded that it requires securing the agreement of petitioners." Reply Brief at 6. Specifically, the Domestic Producers point to the "Powell Memorandum," prepared by Commerce's Chief Counsel for Import Administration in a 1992 antidumping investigation of uranium from the

---

[33]In the companion case challenging the suspension agreement in the related antidumping proceeding, the Government and the Brazilian Exporters made much of the fact that seven of the petitioning U.S. steel producers wrote a letter supporting certain aspects of that agreement. *See* Bethlehem Steel, Slip Op. 01-65 at 21 n.19, 35 n.30. In contrast, none of the petitioners here broke ranks.

former Soviet Union.[34]  *See* Reply Memo at 6-7.  Outlining various options for settlement of that

case and anticipating industry opposition to a subsection (c) agreement, the Powell Memorandum

cited Senator Heinz's statement and cautioned that "[t]he legislative history of this ["more

beneficial"] provision indicates that Congress arguably intended it to require that the domestic

industry consent to this type of agreement."  *See* Powell Memorandum (Reply Memo at Exhibit 1)

at 1, 4.  The Powell Memorandum therefore recommended in that case that Commerce enter into

agreements under the special nonmarket economy ("NME") provisions of the suspension agreement

statute, which do not include a "beneficiality" requirement.  *Id.*

The Executive Summary of the Powell Memorandum, in particular, reinforces the view that

the consent of the domestic petitioners is required for a subsection (c) agreement:

> [M]ost options carry procedural requirements.  These include: *securing the agreement of the domestic petitioner*; finding that the agreement is in the public interest as specifically defined by the statute; and ensuring that the agreement is effectively monitorable.  Taking these difficulties into account, only the settlement option that Congress crafted specifically for nonmarket economies . . . appears capable of settling the investigation.

Powell Memorandum at 1 (*quoted in* Reply Memo at 7-8; emphasis supplied by Plaintiffs).  Indeed,

as the Powell Memorandum counseled, Commerce avoided the beneficiality requirement in the

uranium case by entering into an NME suspension agreement.  *See* Uranium from Kazakhstan,

---

[34]*See* Memorandum from Chief Counsel for Import Administration to Ass't Secretary for Import Administration, re: "Uranium Investigation:  Legal Options For Settlement," Investigation A-461-801 (May 7, 1992) at 1, 4, *attached to* Reply Memo as Exhibit 1 ("Powell Memorandum").

Kyrgyzstan, Russia, Tajikistan, Ukraine and Uzbekistan, 57 Fed. Reg. 49,220 (Dep't Commerce 1992) (suspension notice).[35]

Moreover, the Domestic Producers note, Commerce's prior practice is consistent with the Powell Memorandum. From the Powell Memorandum in 1992, up to the suspension agreements at issue in this case and in the companion antidumping case, Commerce sought and secured the consent of the domestic petitioners to every other subsection (c) agreement. Reply Memo at 8 n.27.[36] Accordingly, the Domestic Producers assert that "the legislative history, as well as the uniform and consistent practice of the Department, mandates that the Department secure the consent of the petitioners" before entering into a subsection (c) agreement such as the Agreement here. Reply Memo at 8-9.[37]

---

[35]To further bolster their argument that subsection (c) historically has been interpreted as requiring the consent of the domestic petitioners, the Domestic Producers point to a paper prepared (albeit in his personal capacity) by the current Chief Counsel for Import Administration. That paper states that agreements under the special NME provisions of the suspension agreement statute may be the only viable option for resolving antidumping investigations involving nonmarket economies because, *inter alia*, "it may be difficult to convince the petitioners to agree to a suspension agreement [under subsection (c)] that raises U.S. prices by less than the full amount of the preliminary margin." John D. McInerny, Lessons of Uranium *in* The Commerce Department Speaks on International Trade & Investment 157, 163 (Practising Law Institute 1994), *cited in* Reply Memo at 7 n.23.

[36]Of course, that the domestic petitioners in those cases did not oppose the subsection (c) agreements does not perforce mean that Commerce viewed their consent as a prerequisite.

[37]Commerce is required to follow prior "precedent" only if it represents a settled rule applied consistently over time. *See* Coalition for Fair Atlantic Salmon Trade v. United States, 101 F. Supp. 2d 821, 824 (Ct. Int'l Trade 2000). There is no need in this case to now decide whether the three prior subsection (c) agreements cited by the Domestic Producers can be said to constitute a longstanding practice. Moreover, even where an established practice exists, an agency may depart from that practice in certain circumstances, provided that the departure is adequately justified. *See* Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 808 (1973).

At a minimum, even if it does not accord petitioners the power to veto a proposed subsection (c) agreement, the "beneficiality" requirement constitutes a very high hurdle for Commerce where, as here, the Domestic Producers maintain that the Agreement is not "more beneficial" than an order.

As in the companion antidumping suspension agreement case, Commerce's "beneficiality" determination in this case rests on its findings that the Agreement provides greater relief and greater certainty than would an antidumping order. Defendant's Memo at 6-7, 29-30 (*citing* Extraordinary Circumstances Memo). In making those findings, Commerce relied solely on the analysis set out in its Public Interest Memorandum. *See* Extraordinary Circumstances Memorandum.

According to Commerce, the Agreement affords the Domestic Producers *greater relief* than a countervailing duty order because it protects them from "future exchange rate-driven surges of Brazilian hot-rolled steel." Defendant's Memo at 30 (*citing* Public Interest Memo). But the Government points to no record evidence to substantiate Commerce's premise – that exchange rate fluctuations were the cause of the surges of Brazilian steel. And, as the Domestic Producers observe, "the injury to the domestic industry in a countervailing duty case comes from the fact that the imports are subsidized, not from the fact that the exchange rate may fluctuate." Plaintiffs' Memo at 47. *See generally* <u>Bethlehem Steel</u>, Slip Op. 01-65 at 30-31.

The other asserted benefit, according to Commerce, is *greater certainty* for the domestic industry. Alluding to the "reference price" provision of the suspension agreement in the related antidumping proceeding,[38] Commerce emphasizes that U.S. producers will benefit from "a set level

---

[38]Under the terms of the suspension agreement in the antidumping proceeding, the Brazilian Exporters are prohibited from exporting the steel at issue to the United States for less than the negotiated "reference price." *See generally* <u>Bethlehem Steel</u>, Slip Op. 01-65 at 11-12.

of relief that will remain in force over the life of the Agreements." Defendant's Memo at 30 (*citing* Public Interest Memo).[39] According to Commerce, "[t]his would not be the case under AD/CVD orders where import levels and prices could vary dramatically from period to period, depending upon a variety of factors that could affect dumping and subsidy rates found." Defendant's Memo at 30 (*citing* Public Interest Memo), 46.

At the outset, the Domestic Producers contest Commerce's asserted right to rely on the alleged benefits of the antidumping suspension agreement in evaluating this Agreement.[40] And they counter that, in any event, "it is unclear how a 'set level of relief' is more beneficial to U.S.

---

[39]*See also* Defendant-Intervenors' Memo at 16-19 (relying on provisions of antidumping suspension agreement, and asserting that the two agreements are "inextricably tied").

The Government did not brief the question whether, as a legal matter, Commerce is entitled to rely on the antidumping suspension agreement in making its "more beneficial" finding on the Agreement here. However, the Government clearly staked out its position on the issue vis-a-vis the "public interest" analysis, arguing that – at least in that context – "it was entirely proper for Commerce to consider the factual circumstances presented by the antidumping suspension agreement." Defendant's Memo at 50.

In any event, as the Government conceded in the companion case, it would have been preferable, for the sake of clarity, for Commerce to have prepared separate Extraordinary Circumstances Memoranda in the two cases. *See generally* Bethlehem Steel, Slip Op. 01-65 at 34-35 n.29. On remand, Commerce will have the opportunity to prepare a separate memorandum for this case.

[40]Parsing the language of the statute, the Domestic Producers assert that the law "does not allow the suspension to be made dependent on a *different* agreement in a *different* case concluded under a totally *different* section of the statute." Reply Memo at 13 (emphasis in the original). Moreover, they emphasize that the antidumping suspension agreement may be terminated or modified independently of the Agreement at issue here. *Id*. In addition, they contend that – assuming *arguendo* that the benefits of the two agreements should be considered together – then those benefits "should be compared to the effect of the combined subsidy rates and antidumping margins." *Id*. at 34. According to the Domestic Producers, "[s]uch enormous duties would surely lock Brazilian imports out of the U.S. market." *Id*.

producers than the *full* relief available from a countervailing duty order." Plaintiffs' Memo at 32 n.81, 46 (emphasis in the original).[41]

Further, as discussed in <u>Bethlehem Steel</u>, Slip Op. 01-65 at 31, certainty is not, in and of itself, a virtue; that is, certainty is not *always* better than uncertainty. Moreover, any suspension agreement will, by definition, produce certainty. Thus, if mere certainty suffices to make a suspension agreement "more beneficial" to the domestic industry than continuation of an investigation, a suspension agreement would be permissible in any countervailing duty proceeding. Clearly, that was not the intent of Congress. *See* S. Rep. No. 96-249 at 54 ("suspension is an unusual action which should not become the normal means of disposing of cases").

Subsection (c) agreements, in particular, are reserved for cases involving "extraordinary circumstances." 19 U.S.C. § 1671c(c)(4); S. Rep. No. 96-249 at 54 (subsection (c) agreements to be accepted only "very rarely"); H.R. Rep. No. 96-317 at 55 (extraordinary circumstances determination to "be made rarely and only upon a compelling showing"). In short, Commerce cannot logically rely on a fact that is true with respect to any investigation as the basis for its determination that a particular case involves extraordinary circumstances. As the House Committee on Ways and Means emphasized:

> [T]he ["more beneficial"] provision is not intended to be so general as to be *meaningless*. For example, the expenses saved because of prompt settlement of a case or the certainty of prompt relief may make settlement more beneficial than continuation of the investigation. However, *every suspension of an investigation*

---

[41]The Domestic Producers assert that the relief under the Agreement is "vastly inferior" to the relief under an order, because the Agreement "permits subsidized imports to enter the United States at levels significantly exceeding historical norms without paying countervailing duties." Plaintiffs' Memo at 31; Reply Memo at 15.

> *results in prompt, certain relief and reduced expenses. The Committee does not*
> *intend that for this reason every agreement be deemed more beneficial to domestic*
> *industry.*

H.R. Rep. No. 96-317 at 65 (emphasis supplied) (concerning suspension of antidumping investigations); *see also id.* at 54 (discussion of "beneficiality" requirement in context of suspension of antidumping investigations applies with equal force to countervailing duty investigations).[42]

The Brazilian Exporters place great emphasis on the Agreement's quota, which (since October 1, 1999) has limited exports to the United States to 295,000 metric tons per year. *See* Agreement, Part IV, 64 Fed. Reg. at 38,798. They first contend that the quota caps Brazilian steel

---

[42]The Domestic Producers argue that, here, there were no benefits from "early settlement," because the Agreement was concluded on the statutory deadline for Commerce's issuance of the final countervailing duty determination. The Domestic Producers assert that, by then, they "had already incurred the burden of fully litigating the case," so that there were no "expenses saved because of prompt settlement." Indeed, the Domestic Producers maintain that "[r]elief under the Agreement was no more 'prompt' than relief resulting from entry of an order." Plaintiffs' Memo at 30-31 (footnotes omitted).

The Government and the Brazilian Exporters give these arguments short shrift, emphasizing that Commerce did not rely on "early settlement" as a benefit of the Agreement. Defendant's Memo at 31; Defendant-Intervenors' Memo at 19-20. But the Domestic Producers posit that the legislative history suggests that a suspension agreement *must* expedite relief to the domestic industry. *See* Plaintiffs' Memo at 30 n. 75 (*quoting* statement of Congressman Shannon at 125 Cong. Rec. 17,862-63 (1979) ). And, indeed, Commerce itself recognized that much of the value of suspension agreements lies in their *timing*, when it revised its own regulations to significantly advance the deadlines for initialing and signing such agreements. *See generally* n.24, *supra*. In mandating that any potential suspension agreement be considered immediately following Commerce's issuance of its preliminary determination, Commerce recognized that the accelerated timeline would save time and money by "reduc[ing] burdens on all parties by eliminating the need to file case briefs, rebuttal briefs, and . . . participate in a hearing, if a suspension agreement is accepted." 61 Fed. Reg. at 7315. On the other hand, the legislative history indicates that Congress contemplated that, in appropriate cases, Commerce could accept a suspension agreement as late as its final determination. *See*, *e.g.*, S. Rep. No. 96-249 at 15 (suspension to occur "prior to a final determination by the administering authority").

exports at "a significant reduction in tonnage" below 1997 and 1998 levels. Defendant-Intervenors' Memo at 12-13. The Domestic Producers counter that "unfairly traded imports were surging in 1997 and 1998," and that – using 1995 and 1996 as the baseline instead – the quota fixed in the Agreement "exceeds the historical norm by a whopping 53 percent." Reply Memo at 10.

Similarly, the Brazilian Exporters note that a countervailing duty order places no limit on import volumes, so that importers would be free to import as much Brazilian steel as they wish so long as they paid the requisite duties. Defendant-Intervenors' Memo at 13-14; *see also* Tr. at 63 (counsel for Government argues that Agreement "limit[s] market share in a way that a CVD order never could"). However, as the Domestic Producers point out, an order would subject every single ton of subsidized steel to the payment of countervailing duties, while the Agreement permits 295,000 metric tons (325,248 short tons) of subsidized steel to enter the United States every year free of such duties. Reply Memo at 11.

Finally, the Brazilian Exporters claim that the Agreement's quota imposes an "absolute and consistent cap" on the quantity of Brazilian steel that may enter the United States in any given year, while – under an order – the countervailable subsidies would be amortized over time, so that countervailing duties would decline and it would become increasingly easier for Brazilian producers to export to the United States. Defendant-Intervenors' Memo at 14. But the Domestic Producers dispute that alleged benefit as well, arguing, first, that – under an order – the subsidy rate could be reduced only if an administrative review were conducted; and, second, if such a review were conducted, the subsidy rate would in fact *increase* to the extent that new domestic or other subsidies were found. Reply Memo at 11-12.

The Brazilian Exporters also highlight as a benefit of the Agreement the Brazilian Government's "agreement not to bestow . . . export and import substitution subsidies, and to notify the Commerce Department any time it has reason to believe that such subsidies exist."[43] Defendant-Intervenors' Memo at 16 (*referring to* Agreement, Part III.C, 64 Fed. Reg. at 38,798). According to the Brazilian Exporters, that undertaking "avoids the costly and time-consuming mechanism of administrative reviews to determine the existence of future countervailable benefits." *Id.* The Domestic Producers retort that export and import substitution subsidies were not the cause of the injury at issue in the investigation (and are therefore irrelevant), and that the Agreement's related notification requirements simply restate certain of the Brazilian Government's pre-existing WTO obligations. Reply Memo at 12-13. Moreover, the Domestic Producers note, Commerce would still have to conduct an administrative review to determine the increased subsidy rate. *Id.* at 13.

As discussed in section IV.A above, this case is being remanded to enable Commerce to reconsider its Suspension Determination, giving due consideration to petitioners' comments and undertaking any further consultation that may be appropriate. On remand, Commerce will have the opportunity at the administrative level to explain its interpretation of the "more beneficial" requirement, in light of the statute's legislative history and Commerce's own prior practice. More importantly, Commerce will have the opportunity to detail, in light of petitioners' comments (and with the benefit of their amplification before the Court), precisely why the Agreement is more

---

[43]Although the Public Interest Memorandum cites the Agreement's provision on export and import substitution subsidies as providing "greater certainty" for all parties, the Government contends that the provision is basically superfluous. According to the Government, Commerce's "beneficiality" determination could be sustained on the basis of the Agreement's quota alone. *See* Tr. at 58-59.

beneficial to the domestic industry than a countervailing duty order – even though at least a substantial segment of the domestic industry believes that it is not.

## 2.  Whether the Investigation Was Complex

Even if Commerce properly concluded that the Agreement is more beneficial to the domestic industry than continuation of the investigation, that would not suffice to constitute the "extraordinary circumstances" required to justify a subsection (c) agreement.  Commerce must also determine that the investigation is "complex."  19 U.S.C. § 1671c(c)(4).  The Domestic Producers vigorously contest that determination in this case.

For purposes of the statute, an investigation is deemed "complex" if "(i) there are a large number of alleged countervailable subsidy practices and the practices are complicated, (ii) the issues raised are novel, or (iii) the number of exporters involved is large."  19 U.S.C. § 1671c(c)(4)(B). Commerce apparently relied on the first two criteria in determining that the investigation here at issue was complex.  *See* Extraordinary Circumstances Memo.

### (i)  Whether There Were A Large Number of Complicated Subsidy Practices At Issue

As to criterion (i) – the number and complexity of the subsidy practices alleged – Commerce's Extraordinary Circumstances Memorandum stated that the investigation here involved "four programs" and "complex issues concerning affiliation and the privatization of three separate

companies." But the parties cannot agree even as to *number* of subsidy "practices" at issue – much less whether or not that number is "large."[44]

The Domestic Producers contend that the number of practices is actually *lower* than Commerce suggests. Specifically, the Domestic Producers maintain that the four "programs" actually constitute only two "practices": equity infusions and tax deferrals. Plaintiffs' Memo at 34-36; Reply Memo at 16. In any event, they argue – whether the number of practices is two or four – neither number is a "large number" within the meaning of the statute. Plaintiffs' Memo at 36; Reply Memo at 16. The Brazilian Exporters, in turn, assert that Commerce significantly *understated* the number of programs at issue in the investigation. Defendant-Intervenors' Memo at 23-31. And the Government claims that sometimes a single "program" may involve numerous "subsidy practices," which they assert was the fact in this case. Defendant's Memo at 34.

The Domestic Producers condemn as pure *post hoc* rationalization the Government's efforts to treat as a "multitude" of "practices" the four "programs" mentioned in the Extraordinary Circumstances Memorandum. Reply Memo at 16-17. As the Domestic Producers note, Commerce

---

[44]As discussed in <u>Bethlehem Steel</u>, Slip Op. 01-65 at 38-39, "large" is a relative term. Commerce stated that the investigation at issue there "involve[d] a large number of transactions and multiple adjustments." *Id*. at 38 (citations omitted). In contrast, Commerce here stated only that the investigation involved "four programs" and "complex issues." *See* Extraordinary Circumstances Memo. Only after the fact – in the Government's brief – are those statements synthesized into a conclusion that the investigation at issue in this case involved a "large number" of "subsidy practices." *See* Defendant's Memo at 32-33.

In support of their argument that the investigation here did *not* involve a "large number" of "subsidy practices," the Domestic Producers contrast it with other recent countervailing duty investigations. Plaintiffs' Memo at 36 n.89. In particular, they note that Certain Cut-to-Length Carbon-Quality Steel Plate from Italy "listed 36 'programs' of all types and varieties." *See id*., *citing* Certain Cut-to-Length Carbon-Quality Steel Plate from Italy, 64 Fed. Reg. 73,277 (1999).

justified its "extraordinary circumstances" determination on the basis of four "programs," and said nothing about any of those programs involving more than one "practice." *Id*.[45]

Unless the Extraordinary Circumstances Memorandum's reference to "programs" is read as a synonym for "practices," Commerce made no determination as to the number of practices at issue in the investigation and therefore could not rely on the first criterion for finding "extraordinary circumstances" in this case. But there is no need to reach that issue here. For the reasons set forth in section IV.A above, this case is being remanded. On remand, Commerce will have the opportunity to articulate its interpretation of the statute's reference to a "large number," as well as its definition of a "practice" (as the term is used in the statute), with the benefit of petitioners' comments (as amplified in their briefs before the Court).

Even if the investigation in fact involved a large number of alleged subsidy practices, criterion (i) would be satisfied only if those practices were also "complicated." 19 U.S.C. § 1671c(c)(4)(B)(i). In its Extraordinary Circumstances Memorandum, Commerce stated that the investigation here involved "complex issues concerning affiliation and the privatization of three separate companies." The Government's brief seeks to amplify that statement, by explaining that the respondents were part of a complex web of intercorporate relationships. Defendant's Memo at 35. The Government further notes that the respondents were privatized, and claims that "[t]he unique transactions that gave rise to [the] various changes in ownership were exceedingly complex."

---

[45]The Domestic Producers further argue that the Government's interpretation conflicts with the plain language of the statute. According to the Domestic Producers, the Government effectively renders the word "practices" mere surplusage, by reading the statute to require not a "large number of . . . subsidy *practices*," but only a "large number of . . . *subsidies*." Reply Memo at 18 (first emphasis in the original; second emphasis supplied).

*Id.* The Domestic Producers counter that Commerce was already familiar with many of the relevant facts from prior investigations, greatly simplifying the review of respondents' affiliations and privatizations.[46] Reply Memo at 22. Moreover, they note, Commerce largely resolved the affiliation and privatization issues in the Preliminary Determination. Thus, suspending the investigation did not spare Commerce from the need to address those allegedly "complicated" issues. *Id.*[47]

Because the case is being remanded, there is no need to determine whether – on this record – Commerce properly determined that the subsidy practices at issue were complicated. On remand, Commerce will have the opportunity to revisit the issue, with the benefit of petitioners' comments (as amplified here), and to articulate clearly the basis for whatever determination it may make.

---

[46]The Brazilian Exporters argue that the subsidy practices were complicated because Commerce had to determine "whether the infusions should be maintained in Brazilian currency and corrected using inflation indices, or whether the historical value of each infusion should be converted into dollars based on an exchange rate during the month of the infusion"; whether to dollarize using month-end or monthly average exchange rates; and the amortization period for the equity infusions. Defendant-Intervenors' Memo at 31-32. But, according to the Domestic Producers, Commerce resolved each of those issues in a 1992-93 investigation of Brazilian steel, and here simply followed its practice from that earlier investigation. Reply Memo at 23-24.

[47]In its brief, the Government singles out the use of "privatization currencies" in particular as an issue that Commerce had never seen before. Defendant's Memo at 40. But the Domestic Producers are dismissive. According to the Domestic Producers, the issue of privatization currencies presented only two questions: First, whether the privatization currencies should be valued at their market values (assertedly an easy decision, in light of Commerce's stated "preference to use market values in calculations where possible"); and, second, whether market values were available. Reply Memo at 23. Commerce determined that they were not, and therefore used "facts available." But the Domestic Producers argue that that fact alone did not make the use of privatization currencies "complicated." *Id*.

*(ii) Whether the Issues Raised Were Novel*

The Government argues in the alternative that – even if the investigation did not involve a large number of complicated subsidy practices – Commerce's determination that the investigation was "complex" nevertheless must be sustained because Commerce properly found that it involved issues that were "novel." *See generally* Defendant's Memo at 37-40; 19 U.S.C. § 1671c(c)(4)(B)(ii). Specifically, the Government relies on Commerce's statement in the Extraordinary Circumstances Memorandum that the investigation "involve[d] complex issues concerning affiliation and the privatization of three separate companies."

The Domestic Producers maintain that this was a run-of-the-mill countervailing duty investigation, and vigorously dispute the notion that any "novel" issues were presented. They emphasize that Commerce had addressed the *issues* raised by affiliation in several prior investigations and, indeed, that it had previously investigated in other cases many of the relevant *facts* concerning the very affiliations involved in this case. Plaintiffs' Memo at 39-40.

The Government dismisses the prior antidumping cases as irrelevant, arguing that "affiliation" in an antidumping duty context differs from "affiliation" in a countervailing duty context. Defendant's Memo at 38-39. The Government asserts that the support for the Domestic Producers' argument is thus reduced to one prior countervailing duty case where Commerce addressed affiliation; but the Government seeks to distinguish even that case because it didn't involve any of the companies in this case, or the types of relationships at issue here. *Id.*[48]

_____

[48]Both the Government and the Brazilian Exporters focus, in particular, on assertedly unique aspects of the collapsing analysis in the investigation in this case. Defendant-Intervenors' Memo at 38; Defendant's Memo at 38 n.24. As the Government puts it, "even if it has addressed affiliation

The Domestic Producers are equally adamant that the investigation raised no novel issues concerning privatization. They point to the numerous opinions on the subject rendered in recent years by the U.S. Court of Appeals for the Federal Circuit, and note that Commerce itself has devoted much time and effort to the development and defense of its privatization methodology. Plaintiffs' Memo at 40-41. While they concede that the subject has been contentious, the Domestic Producers observe that the statutory test for complexity is novelty, not controversy. *Id*. at 41. The Domestic Producers further note that Commerce even had familiarity with Brazil's privatization program from a prior investigation and, in fact, drew on that experience in this investigation. *Id*.

The Government emphasizes that Commerce's prior investigation involving Brazil's privatization program was limited to the partial privatization of USIMINAS. Later partial privatizations of USIMINAS had to be addressed in this investigation, as did the privatizations of the other two respondents, COSIPA and CSN. Defendant's Memo at 39-40.

Moreover, according to the Government and the Brazilian Exporters, there were many novel aspects of the privatizations at issue in this case. For example, both the Government and the Brazilian Exporters emphasize that Commerce here considered for the first time the use of "privatization currencies." Defendant's Memo at 40; Defendant-Intervenors' Memo at 36. The Brazilian Exporters further note, *inter alia*, that this investigation was Commerce's first examination of the impact of pre-privatization infusions on the actual terms and conditions of the privatization transactions; that the Brazilian Government's role as a purchaser presented novel issues; and that

_____

and collapsing issues in the past, the unique facts before it in any new case require Commerce to visit the issue anew." Defendant's Memo at 38 n.24.

novel issues arose from the fact that the companies were only partially privatized in the initial transactions, with most or all of the remaining government shares sold in subsequent privatization auctions. Defendant-Intervenors' Memo at 36-37. The Brazilian Exporters also point to the fact that this investigation was the first countervailing duty investigation involving privatized companies in Brazil under the Uruguay Round legislation (which included a new "change in ownership" provision). *Id*. at 37. Finally, the Brazilian Exporters assert that, because they had never before been examined by Commerce, "nearly every aspect" of the tax deferral programs at issue in the investigation presented novel issues. *Id*. at 37-38.

As the Domestic Producers note, however, the statutory criterion that an issue be "novel" requires more than that the issue differ *slightly* from similar issues that Commerce has confronted in the past. There must be some fairly *fundamental* difference.[49] Plaintiffs' Memo at 37-38; Reply Memo at 25-26. Moreover, it is the *issue* that must be novel. The requirements of the statute are

---

[49]To support their argument, the Domestic Producers point to the definitions in a sampling of oft-cited references. *See* Plaintiffs' Memo at 37-38 *and* authorities cited there. The common denominators of those – and other – dictionary definitions of "novel" are terms such as "new," "striking," "strange," "unusual," and "not resembling something formerly known." For example, *Webster's Ninth New Collegiate Dictionary* defines "novel" as "new and not resembling something formerly known or used," *id.* at 809 (1990), while the definition in *Webster's Third New International Dictionary* is "not resembling something formerly known: having no precedent: new" and "original or striking in conception or style: strange, unusual." *Id*. at 1546 (1981). The entry in *The American Heritage College Dictionary* defines "novel" as "[s]trikingly new, unusual or different." *Id*. at 934 (3d ed. 1997). The Domestic Producers also rely on the definition of "novelty"– the nominal form of the adjective "novel" – in *Black's Law Dictionary*: "An invention or discovery is new or possesses requisite element of 'novelty' if it involves the presence of some new element, or the new position of an old element in combination, different from anything found in any prior structure . . . Novelty, in respect to design terminology, is present when the average observer takes the new design for different and not just a modified already existing design." *Black's Law Dictionary* 1064 (6th ed. 1990).

not met simply because a particular investigation involves different facts than prior investigations.[50]

*Id.  See* <u>Bethlehem Steel</u>, Slip Op. 01-65 at 39.  *Every* investigation presents case-specific facts.

Thus, for example, while the tax deferral programs investigated in this case involved new facts, they

did not necessarily involve new *issues* within the meaning of the statute; Commerce has examined

such issues before.  *See generally* Reply Memo at 28.

      Because the case is being remanded, there is no need to reach the question whether – on this

record – Commerce properly determined that the investigation raised novel issues.  On remand,

Commerce will have the opportunity at the administrative level to explain its interpretation of the

statute's "novelty" requirement and, with the benefit of petitioners' comments (as amplified before

the Court), to reconsider the application of that provision to the investigation here, and to articulate

clearly the basis for whatever determination it may make.

---

[50]The Domestic Producers specifically reject the Brazilian Exporters' claim that the investigation presented novel issues because the initial privatizations were only partial.  According to the Domestic Producers, there was no controversy over how to account for partial privatizations; all relevant issues had been resolved in prior cases involving partial privatizations.  Reply Memo at 27.  They also dismiss the Brazilian Exporters' reliance on the Uruguay Round legislation, noting that – prior to the Final Determination here – the Court of International Trade had already held that the legislation did not require any modifications in Commerce's treatment of changes of ownership; thus, the Domestic Producers reason, Commerce could not have considered the legislation to present "novel" issues at the time the Final Determination was made.  *Id*. at 27-28.  In any event, as the Domestic Producers note, the Extraordinary Circumstances Memorandum did not cite the Uruguay Round legislation as a source of "novel" issues.  Reply Memo at 28 n.90.  And it is well-settled law that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."  *See* <u>Securities and Exchange Comm'n v. Chenery Corp.</u>, 318 U.S. 80, 87 (1943).  Commerce's "novelty" determination therefore could not be sustained on the basis of any rationale on which Commerce did not rely.

D.  The Public Interest

In addition to satisfying all other applicable requirements, a suspension agreement must serve

the public interest as well.  19 U.S.C. § 1671c(d)(1).[51]   The statute requires that, in evaluating the

public interest vis-a-vis a quantitative restriction agreement (such as the one at issue here),

Commerce is to take into account – "in addition to such other factors as are considered necessary or

appropriate"– those factors "set forth in subsection (a)(2)(B)(i), (ii), and (iii) of [§ 1671c] . . . , after

consulting with the appropriate consuming industries, producers and workers" in the affected

domestic industry producing like merchandise, including producers and workers not party to the

investigation.  *Id*.

The referenced subsections of § 1671c(a)(2)(B) in turn require that, in evaluating the public

interest, Commerce consider:

(i)      whether, based upon the relative impact on consumer prices and the availability of supplies of the merchandise, an agreement would have a greater adverse impact on United States consumers than the imposition of countervailing duties;

(ii)     the relative impact on the international economic interests of the United States; and

(iii)    the relative impact on the competitiveness of the domestic industry producing the like merchandise, including any such impact on employment and investment in that industry.

---

[51]Specifically, the statute precludes Commerce from suspending an investigation unless "it is satisfied that suspension . . . is in the public interest."  19 U.S.C. § 1671c(d)(1).  The Government emphasizes that the Court's inquiry is essentially limited to ascertaining whether Commerce's determination is supported by substantial evidence, and argues that the statute's use of the term "satisfied" reflects Congress' intent to "confer broad discretion upon Commerce in making [its public interest] assessment." *See* Defendant's Memo at 42-43; *see also* Defendant-Intervenor's Memo at 43-44.

In its Public Interest Memorandum, Commerce concluded that, "*taken together*, the reasons

set out below establish that the *Agreements* are in the public interest." (Emphasis supplied; referring

to both the Agreement in this case as well as the suspension agreement in the related antidumping

case.) According to the Government, Commerce's determination was premised on three reasons:

"First, the Suspension Agreement will ensure that Brazilian hot-rolled steel is fairly traded on the

U.S. market. Second, the Suspension Agreement will eliminate completely the injurious effects of

such imports on the domestic industry. . . . Third, the Suspension Agreement will provide greater

certainty to all parties." Defendant's Memo at 41 (footnotes omitted).

> As to the first two points cited by the Government, the Public Interest Memorandum stated:

> [T]he Agreements will ensure that Brazilian hot-rolled steel is fairly traded in U.S. markets and will reduce import volumes sufficiently to eliminate completely the injurious effects of such imports on the domestic industry. Unlike the situation with AD/CVD orders, the quantitative restriction and reference price requirements imposed on imports under the Agreement will protect the domestic industry from future exchange rate-driven surges of Brazilian hot-rolled steel. Such provisions are particularly important in light of the recent financial crisis abroad and the significant fluctuation in the Brazilian real in recent periods. Thus, the Agreements will help to ensure that domestic producers will be able to compete on fair terms and make the necessary investments in new plant [sic; plants] and equipment, worker training and retraining, and research and development. This will help to increase not only the competitiveness of each producer, but also the competitiveness of the domestic market as a whole. Workers will benefit from reduced trade-related uncertainties about wages and employment, which will improve their performance and productivity.

The Domestic Producers basically contest each of those assertions.[52]

---

[52]As discussed in section IV.C.1 above, the Government invokes the doctrine of exhaustion of administrative remedies to argue that the Domestic Producers are now barred from challenging Commerce's conclusion in the Suspension Determination that the Agreement eliminates completely the imports' injurious effect on the domestic industry because the Domestic Producers failed to

The Domestic Producers fundamentally question how permitting a substantial quantity of subsidized Brazilian steel to enter this country will ensure that it is "fairly traded in U.S. markets" and will "help to ensure that domestic producers will be able to compete on fair terms." Plaintiffs' Memo at 45-46; Public Interest Memo. They further challenge Commerce's claim that the Agreement "will help to ensure that domestic producers will be able to . . . make the necessary investments in new plant [sic; plants] and equipment, worker training and retraining, and research and development," querying "how permitting that subsidized tonnage to continue to depress prices will help domestic producers make needed investments." Plaintiffs' Memo at 45-46.

The Government in turn contends that the Domestic Producers discount the asserted impact on fair competition of the quota established in the Agreement at issue here, combined with the "reference price" provision in the antidumping suspension agreement. Defendant's Memo at 45. *See also* Defendant-Intervenors' Memo at 44 (emphasizing tandem effect of quota and reference price provisions).[53] As discussed above in section IV.C.1, however, the Domestic Producers

_____

petition for ITC review of that determination under 19 U.S.C. § 1671c(h)(3). *See* Defendant's Memo at 43. For the reasons stated in section IV.C.1, there is no need to address that argument here.

[53]The Government also relies on both the quota provision of this Agreement and the reference price provision of the antidumping suspension agreement as support for Commerce's determination that the two suspension agreements will reduce "trade-related uncertainties." Defendant's Memo at 44-45. Commerce found that "workers will benefit from reduced trade-related uncertainties about wages and employment, which will improve their performance and productivity." Public Interest Memo. But the Domestic Producers assert that Commerce's statement "makes no sense." Plaintiffs' Memo at 45. The Domestic Producers wryly contend that the continued importation of subsidized steel "makes certain that wages and employment will continue to be suppressed," but question exactly "how that certainty will improve workers' performance and productivity." *Id*. The Government asserts that the Domestic Producers do not directly dispute Commerce's underlying premise that reduced trade-related uncertainties will benefit workers, and maintains that the mere fact that the Agreement allows imports of subsidized steel to continue does not alter the soundness

maintain that this Agreement must "stand or fall on its own" merits, and cannot be justified by reference to the other suspension agreement. *See* Reply Memo at 29.[54]

The Domestic Producers also attack Commerce's focus on "protect[ing] the domestic industry from future exchange rate-driven surges" of Brazilian steel. *See* Public Interest Memo. The Government asserts that it is uncontested that the Brazilian currency fluctuated during the relevant period, and that those fluctuations resulted in surges of imports into the U.S. market, adversely affecting the U.S. steel industry. Defendant's Memo at 48-49. The Government reasons that, since the competitiveness of the domestic industry is a factor to be weighed under the statute in evaluating the public interest, Commerce did not err in considering the impact of exchange rate fluctuations. *Id.*; 19 U.S.C. §§ 1671c(d)(1), 1671c(a)(2)(B)(iii).

The Domestic Producers point out, however, that the injury in a countervailing duty case is caused not by exchange rate fluctuations, but rather by subsidies. Plaintiffs' Memo at 47. Moreover, they emphasize, exchange rates for all currencies fluctuate, and thus are "part and parcel" of every countervailing duty investigation. Thus, they argue, if exchange rate fluctuations were a legitimate factor justifying a public interest determination, the public interest would always be better served by suspending an investigation – a result Congress plainly did not intend. Reply Memo at 29-30.

---

of Commerce's finding. Defendant's Memo at 43-45.

[54]Like its Extraordinary Circumstances Memorandum, Commerce's Public Interest Memorandum addressed the suspensions of both the countervailing duty investigation and the antidumping investigation. For the sake of clarity, Commerce may wish to reconsider that approach on remand. *See* n.39, *supra*.

The Government cites as the third and final basis for Commerce's public interest determination the "greater certainty" it is said to provide to all parties – U.S. producers, U.S. consumers, and Brazilian producers.  Defendant's Memo at 41; Public Interest Memo.  Yet again, the Domestic Producers dispute each and every assertion underlying Commerce's claim.  *See generally* Plaintiffs' Memo at 46-48.

For example, in its Public Interest Memorandum, Commerce asserted:

[T]he Agreements will give U.S. consumers continued access to Brazilian hot-rolled steel at a known level and provide U.S. producers a set level of relief that will remain in force over the life of the Agreements.  This would not be the case under AD/CVD orders where import levels and prices could vary dramatically from period to period, depending upon a variety of factors that could affect dumping and subsidy rates found."

The Domestic Producers question "why the public interest is served by maintaining consumer access to subsidized imports."  Plaintiffs' Memo at 46.  As the Government notes, the statute mandates that Commerce consider whether "the agreement would have a greater adverse impact on United States consumers than the imposition of countervailing duties."  Defendant's Memo at 47 (*citing* 19 U.S.C. §§ 1671c(d)(1), 1671c(a)(2)(B)(i) ).  But simply citing the statute does not explain how U.S. consumers in this case benefit more from the Agreement than they would from an order.

The Domestic Producers also dispute whether "a set level of relief" is better for U.S. producers than the "full relief" available under a countervailing duty order, and challenge Commerce's assertion that – under an order – import levels and prices could vary dramatically from period to period, affecting subsidy rates.   Plaintiffs' Memo at 46.

The Government argues that – contrary to the Domestic Producers' claims –  price relief under an order "cannot be said to be either full or set."  Defendant's Memo at 47.  The Government

contends that the term "a set level of relief" refers to the reference price provision in the suspension agreement in the related antidumping proceeding, which precludes the Brazilian Exporters from selling below a certain price – something they would be permitted to do under an order, provided they paid the requisite duties. Defendant's Memo at 46. Again, the Domestic Producers contest Commerce's asserted right to rely on the provisions of another suspension agreement in evaluating the public interest justification for this one. *See* Plaintiffs' Memo at 48 n.121; Reply Memo at 29 n.94.

The Domestic Producers further question Commerce's claim that "import levels and prices could vary dramatically" under an order, "depending upon a variety of factors that could affect dumping and subsidy rates found." *See* Public Interest Memo. They assert that Commerce's claim of uncertainty is misleading because, under an order, the subsidy amount in future years for equity infusions is determined when Commerce initially allocates the benefit. Plaintiffs' Memo at 46. The Government observes that a fixed subsidy amount is no guarantee of certainty in future subsidy rates, because future subsidy rates can vary depending on the subsidy recipient's future sales (since a subsidy rate is determined by dividing the allocated benefit by the firm's sales in the relevant period of review). Defendant's Memo at 47-48.

Moreover, the Government notes, the Domestic Producers' analysis appears to assume that an order would necessarily result in an increase in the U.S. price of Brazilian steel equal to the subsidy rate. But the Government postulates that, for example, a Brazilian producer or exporter could decide itself to absorb part or all of the cost of the duty. Defendant's Memo at 46-47. The

Government therefore rejects the Domestic Producers' characterization of an order as affording "full relief."

The Domestic Producers note, however, that it is always the case that future subsidy rates can fluctuate depending on the amount of future sales, just as it is always the case that subsidized producers conceivably could choose to absorb countervailing duties (rather than reflect them in prices). Reply Memo at 29-30. If those facts were valid public interest justifications for suspending an investigation, the Domestic Producers reiterate, then *every* investigation could be suspended. *Id*.

The Domestic Producers mount the same attack on Commerce's finding that the Agreement "will benefit U.S. importers and consumers by eliminating the risk and uncertainty associated with contingent . . . duty liabilities." *See* Public Interest Memo. As the Domestic Producers note, retroactive duty assessments and cash deposit requirements are inherent in every countervailing duty order. Plaintiffs' Memo at 47; Reply Memo at 29-30. Accordingly, they argue, the "certainty" resulting from the elimination of contingent duty liabilities which Commerce cites as a public interest justification for suspension of this investigation applies with equal force to the suspension of every other investigation. *Id*.

Finally, noting that neither export nor import subsidies were at issue in the investigation here, the Domestic Producers challenge Commerce's reliance on the Agreement's "firm commitment" from the Brazilian Government not to provide them. Plaintiffs' Memo at 47-48 (*quoting* Public Interest Memo). Neither the Government nor the Brazilian Exporters have responded directly to the Domestic Producer's assertion that "[t]he public interest is not served by an Agreement that addresses practices not at issue while ignoring the subsidies that caused injury: equity infusions."

*See* Plaintiffs' Memo at 48.  *But see* n.43, *supra*, *citing* Tr. at 58-59 (counsel for the Government

asserts that provision  prohibiting import/export substitution subsidies is "additional relief," above

and beyond that required by statute).

For the reasons set forth in section IV.A above, this case is being remanded to Commerce

for further consideration.  Accordingly, there is no need to determine whether – on this record –

Commerce properly determined that the Agreement is in the public interest.  On remand, Commerce

will have the opportunity to explain its interpretation of the public interest requirements of the

statute, to reconsider its public interest analysis in light of the petitioners' comments as amplified

in their briefs before the Court, and to articulate clearly the basis for whatever determination it may

make.[55]  *See generally* Bethlehem Steel, Slip Op. 01-65 at 41-42 n.38, *citing* U.S. Steel Group v.

United States, _____ CIT _____, Slip Op. 00-156 at 9-10 (Nov. 21, 2000).

---

[55]The statute requires, for example, that Commerce's public interest analysis consider "the relative impact on the international economic interests of the United States" (19 U.S.C. § 1671c(a)(2)(B)(ii) ).  However, that factor does not appear to be addressed in Commerce's Public Interest Memorandum (at least not expressly) – a potential concern (in varying degrees) as to other public interest factors as well.  *See* Public Interest Memo.

Commerce's rationale must be articulated with sufficient clarity so that the Court can verify that Commerce took into account all relevant public interest factors under the statute, and "satisfy itself that the agency exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *See* Greater Boston Television Corp. v. Federal Communication Comm'n, 444 F.2d 841, 850 (D.C. Cir. 1971).

## V. <u>Conclusion</u>

For the reasons set forth above, this case is remanded to the Department of Commerce to enable it to comply with the notice, comment and consultation requirements of the suspension agreement statute; to allow it to articulate its interpretation of the monitoring provisions of the statute; to afford it the opportunity to articulate its interpretation of certain provisions of the "extraordinary circumstances" requirement of the statute (including the "beneficiality" provision, as well the terms "large number," "subsidy practice," and "novel"); to allow it to articulate its interpretation of the public interest requirement; and to permit it to reconsider the Suspension Agreement and its underlying Suspension Determination in that light.

A separate order will be entered accordingly.

_____
                    Delissa A. Ridgway
                    Judge

Decided:   August 3, 2001
               New York, New York